**Tammi McDANIEL, individually and as trustee for the heirs and next of kin of Sandy McDaniel, Plaintiff,**

v.

**BIEFFE USA, INC., and Bieffe Helmets SRL, Defendants.**

No. Civ. 97–385 (JRT/FLN).

United States District Court, D. Minnesota.

Feb. 4, 1999.

Robert P. Christensen and Steven W. Anderson, Dunkley, Bennett & Christensen, Minneapolis, MN, for plaintiff.

Brian N. Johnson and Cortney G. Sylvester, Halleland, Lewis, Nilan, Sipkins & Johnson, Minneapolis, MN, for defendants.

## MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TUNHEIM, District Judge.

Plaintiff Tammi McDaniel brought this action on behalf of the heirs of Sandy McDaniel, who died as a result of head injuries he received in a motorcycle accident on July 14, 1995. Plaintiff alleges that defects in the retention system of the helmet McDaniel was wearing—which was manufactured by defendant Bieffe Helmets SRL in Italy and sold in this country by defendant Bieffe USA, Inc.—caused the helmet to come off his head during impact and thereby caused his fatal head injury. She asserts negligence, strict liability, and breach of express and implied warranty claims against both defendants.

This matter is before the Court on defendants' (collectively "Bieffe") motion for summary judgment. Bieffe argues that it is entitled to summary judgment on all of plaintiff's claims because plaintiff has presented no evidence demonstrating that the helmet's alleged defect was more likely than not the cause of McDaniel's death. Bieffe also contends that the post-sale failure to warn and duty to recall portions of plaintiff's negligence claims fail as a matter of law. For the reasons set forth below, Bieffe's motion is granted in part and denied in part.

## BACKGROUND

Bieffe designed and manufactured the helmet—known as the "BF85"—that McDaniel allegedly wore on the day of the accident. McDaniel acquired the helmet from a friend at the time the friend sold him a motorcycle. According to the motorcycle's bill of sale, this transaction occurred on April 29, 1987. The friend believes that he also purchased the helmet, probably used, two or three years before he transferred it to McDaniel.

The helmet has a velcro strip on the chin strap to give the rider a means of fastening down the loose end of the strap after it has been passed through the retaining bar. Plaintiff claims the presence of this strip induces helmet users to fasten the helmet without properly securing the chin strap. Prior to McDaniel's accident, Bieffe knew of at least one other incident in which a helmet with a velcro strip came off a rider's head on impact.

The Snell Memorial Foundation ("Snell") informed Bieffe in 1988 that this particular velcro strip may induce users to attach the chin strap improperly. Snell is a non-profit corporation which researches and tests safety helmets, and certifies helmets that meet its safety standards. Snell initially certified the BF85. However, in its 1988 notice to Bieffe regarding velcro strips, it indicated that such strips are unsafe, additional warnings at the time of sale may be insufficient, and the addition of velcro violates good engineering practice. Snell also stated that it would no longer certify helmets with velcro on chin straps, although it did not decertify

the BF85. Bieffe notes that the Snell notice did not set forth a history of accidents or any results of tests or studies.

Beginning in the late 1980s, Bieffe began including instructions with its new helmets that informed purchasers of the correct way to attach and secure the helmets. Bieffe did not undertake any effort to provide such instructions to owners of previously purchased helmets.

On the day of the accident, McDaniel was seen wearing the subject helmet. The fatal collision occurred at an intersection in St. Paul, Minnesota. As McDaniel was proceeding through the intersection (he had a green light), a van ran a red light and struck McDaniel's motorcycle. Plaintiff contends the helmet came off and McDaniel's unhelmeted head struck the hard surface. Minutes later, emergency personnel found McDaniel without the helmet on his head. He died at the scene.

The parties agree on the injuries McDaniel sustained. The Ramsey County Medical Examiner, Dr. Michael McGee, performed an autopsy on McDaniel after the accident. He concluded that McDaniel had sustained closed head trauma consisting of a subgaleal hematoma, a basilar skull fracture, a subarachoid hemorrhage, and cortical contusions. At his deposition, Dr. McGee testified that he had identified the subgaleal hemorrhage on the upper right side of the back of McDaniel's brain. He also stated that he had observed a transverse basilar skull fracture dividing the skull basically into two equal parts by extending from behind the subject's right ear, across the base of the skull, across the midline, and onto the left side. Dr.

McGee further testified that this closed head trauma caused McDaniel's death.[1]

Plaintiff contends that McDaniel suffered his fatal injury when he struck his unhelmeted head on some hard surface. Bieffe argues that McDaniel struck his chin on a hard surface and that the upward blow to the chin caused the fatal fracture. The parties agree that if the head trauma which led to McDaniel's death was caused by an impact to the chin, the alleged defect in the helmet was not the cause of death. The parties dispute whether Dr. McGee's testimony could support a finding that a side of the head impact was a more likely cause of death than a chin impact.[2]

Dr. McGee stated that the skull fracture and McDaniel's death could have been caused by an impact to the chin or to the right, back side of the head.[3] When asked which cause was more likely, Dr. McGee testified as follows:

> I can only tell you based on experience the more likely that [sic] we have seen in our office is the impact from the upper lateral aspect of the occipital region as described has been associated with basilar skull fractures as seen in the case of Mr. McDaniel.

Dr. McGee noted in his autopsy that he observed an abrasion and laceration on McDaniel's chin. In his deposition, he acknowledged that superficial injuries to the chin might be present when a transverse basilar skull fracture results from a blow to the chin.[4] However, Dr. McGee also observed abrasions and contusions on McDaniel's face. He then testified that had McDaniel been wearing a helmet with a full-face

---

1. There is some dispute over which injury resulting from the closed head trauma actually caused McDaniel's death. Dr. McGee testified that "It is my belief that the closed head trauma resulting in the skull fracture and the contusions and hemorrhage are the cause of the subject's death." Plaintiff interprets this testimony as supporting the conclusion that the basilar skull fracture, hemorrhage, and the contusions caused McDaniel's death. Bieffe contends, based on its expert's opinion and other testimony of Dr. McGee, that the basilar skull fracture, specifically, was the death-causing injury. The parties appear to agree, however, that the event that caused the trauma is the only fact over which there is material disagreement

2. It appears that Bieffe has retained its own medical expert, but for purposes of summary judgment, the parties have focused on whether Dr. McGee's testimony creates a genuine issue of material fact.

3. Dr. McGee testified that the hemorrhaging underneath the scalp was consistent with a blow to the right, back side of the head.

4. Yet Dr. McGee also testified that he had observed no broken teeth or jaw fractures, other items that would have been consistent with a chin impact.

visor, he would not expect him to receive such facial injuries. Furthermore, while he found no additional evidence of a blow to the side of the head, he concluded the injuries were consistent with a blow to the back, right side of the head.

Dr. McGee went on to testify that he believes, based on his experience, that McDaniel did not have a helmet on at the time the injuries were sustained. He testified that he "would not expect to see the injuries described in the autopsy protocol if the subject had been wearing a helmet with a full-face visor or protective area on the front of the helmet."[5] He further testified that such injuries could have resulted from an impact to the chin, but only if McDaniel's head was tipped back, the chin was exposed, and the impact occurred on the bottom of his chin.

## ANALYSIS

### I. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment, stating in pertinent part:

> [Summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Initially, the movant bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the movant's showing, the evidence offered by the non-moving party is to be believed and all justifiable inferences therefrom are to be drawn in the light most favorable to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where a moving party makes and supports a motion for summary judgment in accordance with Rule 56, a party opposing the motion may not rest upon the allegations or denials of its pleadings; rather, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. 2505; *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995). Accordingly, the nonmovant "must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial." *Wilson v. Southwestern Bell Tel. Co.*, 55 F.3d 399, 405 (8th Cir.1995).

### II. Cause of Death

To establish Bieffe's liability for the alleged defect in the BF85, plaintiff must prove that the defect probably, or more likely than not, caused the injury. *See, e.g., Walton v. Jones*, 286 N.W.2d 710, 715 (Minn. 1979) (holding, in the medical malpractice context, that a plaintiff must prove that the alleged negligence more likely than not caused the victim's death); *Block v. Target Stores, Inc.*, 458 N.W.2d 705, 711 (Minn.Ct. App.1990) (stating the plaintiff must prove that the condition of the floor at issue probably caused his injuries). Bieffe contends that although plaintiff has adduced some evidence that would support a finding that the helmet defect caused McDaniel's death, there is no evidence which suggests the defect is the more likely cause. For this reason, Bieffe argues, all of plaintiff's claims fail as a matter of law.

As an initial matter, the Court notes that its inquiry at this stage is limited. Contrary to Bieffe's suggestion, simply because the evidence establishes that there was more than one possible cause for McDaniel's death does not mean that it is entitled to judgment as a matter of law. Dr. McGee's inability to

---

5. Moreover, he stated that "[i]f the subject had been wearing the helmet, the injuries present I don't believe would have been seen or [sic] have been less prominent and would have allowed the subject a greater chance of surviving the accident, yes."

state a cause with certainty or to rule out another possible cause does not lead to the conclusion that plaintiff cannot establish that a head impact was the more probable cause. *See, e.g., Block,* 458 N.W.2d at 710 (citing numerous Minnesota decisions holding that absolute certainty in the opinion of an expert is not essential to demonstrate cause). Likewise, Bieffe ignores this Court's mandate on summary judgment review when it suggests that this Court should decide for itself whether the evidence in the record indicates that a head impact was the probable or more likely cause of McDaniel's death. At this stage, plaintiff simply must make a showing that there is sufficient evidence in the record from which a reasonable jury (not the Court) could conclude that a head impact, rather than a chin impact, was the more likely cause of the fatal injuries.

■ Applying this standard, the Court believes that there is a genuine issue of material fact with regard to causation. A reasonable jury could conclude from Dr. McGee's testimony that some kind of head impact was the probable or most likely cause of McDaniel's closed head trauma, and hence, his death. Although his testimony is not entirely clear, it appears that Dr. McGee indeed opined that the closed head trauma most likely was caused by a blow to McDaniel's head. This interpretation of Dr. McGee's testimony is consistent with his conclusion that he "would not expect to see the injuries described in the autopsy protocol if the subject had been wearing a helmet with a full-face visor or protective area on the front of the helmet." [6]

Moreover, the Court believes Dr. McGee's opinion is supported by facts in the record. His conclusion is based on the types of skull and brain injuries he observed during the autopsy, his medical expertise, and his experiences examining helmeted and unhelmeted victims of motorcycle accidents. That there was no other direct evidence of an impact on the side of McDaniel's head weighs against Dr. McGee's conclusion. However, this lack of other evidence does not preclude, as a matter of law, acceptance of Dr. McGee's opinion. Likewise, while the presence of chin injuries may support Bieffe's theory, Dr. McGee's testimony suggests that these injuries certainly do not rule out a head impact.[7]

Thus, Dr. McGee's opinion, if accepted, provides sufficient evidence to support a jury finding that a head impact was the probable or more likely cause of McDaniel's death.[8] Summary judgment on the issue of causation therefore is inappropriate.

## III. Post–Sale Failure to Warn

Bieffe contends that the post-sale duty to warn portion of plaintiff's negligence claims must be dismissed because the facts in this case are decidedly different than those in cases in which Minnesota courts have imposed such an exceptional duty. Plaintiff responds that "special" circumstances are present in this case which support imposition of a duty on Bieffe to warn helmet users of the danger of using the velcro strip to attach the chin strap. In the absence of any Minnesota decision directly on point, this Court's task is to determine what it believes the Minnesota Supreme Court would do in this circumstance. *See, e.g., Fuqua v. Unisys Corp.,* 716 F.Supp. 1201, 1205 (D.Minn.1989) ("[I]n the absence of a Minnesota Supreme Court decision, this Court is obligated to determine the ruling that the Minnesota Supreme Court would adopt."); *Wilson v. Colonial Penn Ins. Co.,* 454 F.Supp. 1208, 1211 n. 4 (D.Minn.1978) (same).

---

**6.** The Court disagrees with Bieffe's contention at oral argument that this statement was only in reference to the bruises on McDaniel's face. Dr. McGee made this statement in response to a question including a reference to the "brain contusions" that he observed. Also, as set forth above, Dr. McGee stated (in response to the next question regarding McDaniel's possible surviving the collision if the helmet had been on his head) that "[i]f the subject had been wearing the helmet, the injuries present I don't believe would have been seen or [sic] have been less prominent

and would have allowed the subject a greater chance of surviving the accident, yes."

**7.** Moreover, the lack of other indicia of a chin impact, such as broken teeth or a broken jaw, may weigh against Bieffe's chin impact theory.

**8.** Plaintiff has provided other expert testimony, but, given the Court's conclusion, it need not address that additional testimony here.

Minnesota expressly recognized a post-sale duty to warn in *Hodder v. Goodyear Tire & Rubber Co.,* 426 N.W.2d 826, 833 (Minn. 1988), *cert. denied,* 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989). The *Hodder* court did not articulate a test for determining when such a duty applies, although it did state that the duty "arises only in special cases." *Id.* It simply concluded, after discussing a number of factors present in that case, that the circumstances warranted imposing a post-sale duty to warn on Goodyear Tire & Rubber Company, the manufacturer of "K-rims," the allegedly defective product at issue in that case. *See id.* The court provided the following analysis:

> On the facts of this case, we hold that a continuing post-sale duty to warn existed and was adequately submitted. Hundreds of thousands of K-rims have been used in millions of tire changes over the years without incident; of the 134 or so K-rim explosions which did occur, many are explained by improper servicing or misuse. Goodyear steadfastly maintains its K-rim is a safe product if used properly. Nevertheless, it became evident by the late 1950's that K-rims could be temperamental; that the margin for error in servicing the K-rim assembly was dangerously small and it might explosively separate with seemingly little provocation; that when explosions did occur, serious bodily injury or death usually resulted; and, therefore, that great care was required in the handling and servicing of K-rims. Further, Goodyear has continued over the years in the tire rim business, and, although all K-rim production was discontinued by 1969, Goodyear continued to advertise its K-rims as late as 1977, and has continued to sell tires and tubes for use with used K-rims. Finally, Goodyear undertook a duty to warn of K-rim dangers. Under these circumstances, it seems to us that Goodyear had a continuing duty to instruct and to warn, so that users of used K-rims would be apprised of safety hazards which, at an earlier time, were not fully appreciated.

*Id.* (citation omitted). Relying on *Hodder,* a few Minnesota courts and federal courts applying Minnesota law have recognized or discussed post-sale duties to warn. *See, e.g., T.H.S. Northstar Assocs. v. W.R. Grace & Co.,* 66 F.3d 173, 177 (8th Cir.1995) (affirming district court's decision to allow a jury to determine whether asbestos manufacturer breached its post-sale duty to warn of dangers relating to its asbestos products); *Ramstad v. Lear Siegler Diversified Holdings Corp.,* 836 F.Supp. 1511, 1517 (D.Minn.1993) (holding a manufacturer had no post-sale duty to warn of dangers associated with an auger because numerous *Hodder* factors were not present); *Kociemba v. G.D. Searle & Co.,* 707 F.Supp. 1517, 1528 (D.Minn.1989) (recognizing a post-sale duty to warn of, and corresponding duty to test for alleged dangers associated with an intrauterine contraceptive device); *Niccum v. Hydra Tool Corp.,* 438 N.W.2d 96, 100–01 (Minn.1989) (holding a successor corporation does not have a post-sale duty to warn of product defects where the successor never succeeded to any service contracts, was not aware of the product's defects, and did not know the location of the product at the time of plaintiff's injury).

Several factors discussed in *Hodder* are present in this case. For example, there is at least a fact dispute whether Bieffe had reason to know that the velcro strip on the BF85 may pose a risk to users.[9] In addition, the dangers the helmet poses may be hidden or unknown to the user, and serious injury or death likely will result from the alleged defect. Finally, Bieffe has continued to sell similar products.

However, there also are significant distinctions between Bieffe's sale of the helmet and the circumstances giving rise to the post-sale duty to warn in *Hodder.* In *Hodder,* the

---

9. For purposes of summary judgment, the Court rejects Bieffe's argument that it had no reason to know of the risks the BF85 posed. Bieffe was aware of at least one circumstance in which one of its helmets with a velcro strip had come off of a motorcyclist's head during an accident. Snell also warned Bieffe in 1988 of the risk of misuse the helmet's velcro strip posed. That the Snell notice did not discuss studies, accidents, or decertification does not preclude a fact dispute on this issue, because Snell informed Bieffe in plain terms that such strips are unsafe. Whether Bieffe was on notice that the BF85 may be unsafe therefore is a question for the trier of fact.

defendant had continued to service the product, had remained in communication with product users, and had otherwise assumed a duty to keep purchasers apprised of developments with regard to the product. *See Hodder,* 426 N.W.2d at 833. In contrast, Bieffe has not continued to "service" or maintain its product, does not sell aftermarket attachments or related products, has not assumed a duty to remain in communication with or warn previous purchasers, and is not otherwise in contact with helmet owners. The BF85 is a mass-produced and widely marketed consumer item. Bieffe's business does not afford it the ability to communicate easily and continually with its customers. In fact, in the circumstances of this case, Bieffe would have had no way of tracking its helmet to McDaniel and could not have known that he would be using it.

*Hodder* did not indicate what factors are determinative in deciding when to impose a post-sale duty to warn. However, the reasoning in several of the decisions addressing *Hodder* suggests that continued service, communication with purchasers, or the assumption of the duty to update purchasers, is a necessary element in determining whether a post-sale duty to warn attaches.[10] *See, e.g., T.H.S.,* 66 F.3d at 177 (suggesting that one of the prongs for determining whether a post-sale duty to warn exists is whether the manufacturer "continued in the business of selling related products and undertook a duty to warn users of post-sale hazards"); *Ramstad,* 836 F.Supp. at 1517 (rejecting the post-sale duty to warn because, among other reasons, the manufacturer had not undertaken a duty to warn); *Niccum,* 438 N.W.2d at 100–01 (refusing to impose a post-sale duty to warn on a manufacturer's successor in part because the successor was not servicing the product and was not in contact with the

purchaser and did not know the location of the product). In addition, some courts in other jurisdictions have expressed a reluctance to impose on manufacturers the heavy burden of locating and warning purchasers (and subsequent purchasers) of mass-produced and widely distributed consumer products with whom manufacturers did not or could not have maintained contact. *See, e.g., Ierardi v. Lorillard, Inc.,* 777 F.Supp. 420, 422–23 (E.D.Pa.1991) (indicating that whether product users can be easily identified is one factor in determining whether to impose a post-sale obligation to warn and finding no such duty in part because the manufacturer would be unable to issue a warning to every purchaser); *Kozlowski v. John E. Smith's Sons Co.,* 87 Wis.2d 882, 275 N.W.2d 915, 923–24 (Wis.1979) (stating that it is "beyond good reason and judgment" to require a manufacturer of mass-produced and widely distributed items to trace owners of the items and warn annually of safety hazards).

Yet at least one court relying on the *Hodder* factors has recognized a post-sale duty to warn of the dangers associated with a mass-produced, widely distributed product. In *Crowston v. Goodyear Tire & Rubber Co.,* 521 N.W.2d 401, 408–09 (N.D.1994), the North Dakota Supreme Court held that Good Year Tire & Rubber Company had a post-sale duty to warn of the (later-discovered) danger of mismatching a sixteen-inch tire with a sixteen-and-one-half inch rim. The Court first rejected imposition of a bright-line rule with regard to mass market consumer products, stating "[s]imply because a product is mass produced and widely distributed does not totally absolve a manufacturer of a post-sale duty to warn under ordinary negligence principles." *Id.* at 408. The court then discussed *Hodder,* construing the

10. *Kociemba* appears to be the only published decision applying Minnesota law in which a court has recognized a post-sale duty to warn where it is not clear whether one of these factors—continued service or maintenance by the manufacturer, continued communication with the user, or post-sale assumption of duty to warn—was present. The *Kociemba* court indicated that the manufacturer of the intrauterine device had assumed a duty to warn of the product's defects, but stated that such a duty was undertaken "presumably when [the product] was

first marketed." *See* 707 F.Supp. at 1528. There is no suggestion in the opinion that the manufacturer had undertaken the task of keeping previous purchasers apprised of newly discovered risks. Thus, the only apparent distinction between the circumstances in *Kociemba* and those at issue here is that the manufacturer in that case continued to market the same product until the time of plaintiff's alleged injury, *see id.* at 1529, while Bieffe has continued to sell related products, but not the helmet at issue.

Minnesota court's reasoning as broad enough to encompass mass-produced products. *See id.* at 408–09. It concluded as follows:

> Although the defendants argue that *Hodder* is distinguishable, we believe the significant "special" circumstances present in that case are also present in this case. In both cases, serious injury was a consequence of the dangers associated with the use of the product. The defendants became aware of those dangers after the manufacture and sale of the product, and those dangers may have been eliminated by appropriate post-sale warnings. The number of individuals exposed to the potential dangers in both cases was significant. Although the number of this [sic] type of products produced militates against individualized notice to the original purchasers, that same factor suggests that the manufacturers cannot totally ignore post-sale information which has the potential to . prevent serious injury to so many people.

*Id.* at 409. The court went on to state a manufacturer can satisfy this duty by "taking reasonable steps to warn foreseeable users about the dangers associated with their product." *Id.* The reasonableness of the post-sale warnings depends on the particular facts in each case. *See id.*

■ This Court is persuaded by the North Dakota court's reasoning in *Crowston* and believes that the Minnesota Supreme Court would interpret *Hodder* in a similar fashion. In certain circumstances, some but not all of the *Hodder* factors may be sufficient to give rise to a post-sale duty to warn. As the North Dakota court made clear, the fact that a product is mass-produced and widely distributed does not necessarily rule out application of this duty when other *Hodder* factors are present. Mass production

and wide distribution may *limit the response the duty mandates* rather than *defeat the duty's existence.* When a manufacturer of a mass produced, widely distributed product becomes aware that there is a danger associated with the product creating a risk of serious injury or death, the manufacturer may have a duty to take reasonable steps to notify users of that danger. It would be unreasonable to require such a manufacturer to track down every purchaser and user. It may be appropriate in certain cases, however, to require a manufacturer to take the steps that are reasonable under the circumstances to disseminate widely notice of the danger. What constitutes reasonable notice is a question of fact.[11] *See Crowston,* 521 N.W.2d at 410; *see also Hodder,* 426 N.W.2d at 834 (leaving for the jury the question of whether warnings were adequate).

■ The *Hodder* factors that were present in *Crowston* —for example, the manufacturer's awareness of the dangers of the product and the threat of serious injury or death— also are present in this case. Moreover, the Court believes that imposition of the post-sale duty to warn is particularly appropriate in the circumstances presented here. Like all motorcycle helmets, the purpose of the BF85 is to prevent serious head injury or death. Bieffe may have had notice that the velcro strip could induce users to misuse the helmet and render it ineffective for that purpose. That the potentially ineffective product at issue here was one designed and used specifically to protect the cyclist's life compels this Court to conclude that "special" circumstances are present in this case which justify the imposition of a duty to warn.[12] Thus, assuming it had adequate notice of the alleged danger, Bieffe had a duty to take

---

**11.** This balanced approach eliminates the wholly unreasonable burdens for which some courts have expressed concern. For example, in *Kozlowski,* the Wisconsin Supreme Court refused to recognize a manufacturer's post-sale duty to warn of dangers associated with a mass produced, widely distributed product because "[i]t would place an unreasonable duty upon these manufacturers if they were required to trace the ownership of each unit sold and warn annually of new safety improvements...." 275 N.W.2d at 924. Under the reasoning in *Crowston,* manufacturers would only have to take reasonable steps

to publish warnings—which may include, for example, sending notices to motorcycle dealers and maintenance shops and advertising in periodicals and industry publications. Unless such information was easily attainable, a manufacturer would not need to hunt down every user.

**12.** The fact that the very purpose of this product is to save lives distinguishes this case from those cases cited above in which courts have refused to impose a post-sale duty to warn.

reasonable steps to alert the public of the risks associated with misuse of the velcro strip.

The Court therefore rejects Bieffe's basis for seeking summary judgment on this theory. The Court recognizes, however, that this holding raises another difficult issue. Even if Bieffe had a post-sale duty to warn in this circumstance and breached that duty, whether the absence of such a warning caused or could have caused McDaniel's death remains an open question.[13] Although both *Hodder* and *Crowston* touch upon the issue of causation, neither decision directly addresses the placement of the burden of proving causation or the standards for establishing causation in the post-sale duty to warn context. The other post-sale duty to warn decisions in this jurisdiction provide no additional guidance.

Given the current state of the record in this case and the absence of clear direction on this issue in *Hodder* and its progeny, the Court will allow additional argument and, if necessary, additional discovery on this issue. If defendants believe they are entitled to summary judgment on plaintiffs' post-sale duty to warn claim because causation cannot be established, they may, within sixty (60) days of this Order, notice such a motion pursuant to the procedures for dispositive motions set forth in the Local Rules. Supporting memoranda shall not exceed fifteen (15) pages. Likewise, either party may conduct further discovery within the next sixty (60) days limited exclusively to seeking evidence arguably relevant to this causation issue.[14] These time restrictions may be extended by agreement of the parties or by motion for good cause shown, but may not be extended beyond the next one hundred twenty (120) days.

## IV. Duty to Recall

▪ Bieffe also argues that the duty to recall portion of plaintiff's negligence claims should be dismissed because Minnesota has not recognized such duty. The Court agrees. While no Minnesota court has addressed this issue directly, this Court is convinced that Minnesota would refuse to impose a duty on manufacturers to recall and/or retrofit a defective product because the overwhelming majority of other jurisdictions have rejected such an obligation. *See, e.g., Tabieros v. Clark Equip. Co.,* 85 Hawai'i 336, 944 P.2d 1279, 1298–1300 (Haw.1997) (citing cases and stating that "virtually every court that has confronted the issue head-on" has rejected this duty); *see also Burke v. Deere & Co.,* 6 F.3d 497, 508 n. 16 (8th Cir.1993) (restating that no such duty exists under Iowa law), *cert. denied,* 510 U.S. 1115, 114 S.Ct. 1063, 127 L.Ed.2d 383 (1994); *Wallace v. Dorsey Trailers Southeast, Inc.,* 849 F.2d 341, 344 (8th Cir.1988) (affirming district court's conclusion that Missouri does not recognize a duty to retrofit); *Gregory v. Cincinnati Inc.,* 450 Mich. 1, 538 N.W.2d 325, 333 (Mich.1995) (holding there is no continuing duty to repair or recall). Thus, plaintiff's negligence claims are dismissed to the extent they are premised on Bieffe's failure to recall the BF85.

## ORDER

Based on the foregoing, and all of the records, files and proceedings herein, **IT IS HEREBY ORDERED:**

1. Defendants' motion for summary judgment [Docket No. 28] is **GRANTED IN PART** and **DENIED IN PART.**

2. Defendants' motion is **GRANTED** as to the portion of plaintiff's negligence claims (Counts Two and Six) premised on defendants' failure to recall the BF85, and this portion of these claims is **DISMISSED WITH PREJUDICE.**

3. Defendants' motion is **DENIED** in all other respects.

4. Defendants may, within sixty (60) days of this Order, notice a supplemental motion for partial summary judgment on the issue of causation (relating to Bieffe's alleged failure to warn), pursuant to the procedures for dispositive motions set forth in the Local

---

13. Both parties make passing references to the issue of the causal connection between the lack of warnings and McDaniel's death. However, neither party offers any analysis on this question.

14. The parties shall not conduct further discovery on the other causation issue discussed above, namely, whether a head or chin impact caused McDaniel's death.

Rules. Supporting memoranda shall not exceed fifteen (15) pages.

5. Either party may conduct further discovery within the next sixty (60) days limited exclusively to seeking evidence arguably relevant to this issue of causation.

6. The time restrictions set forth herein may be extended by agreement of the parties or by motion for good cause shown, up to one hundred twenty (120) days following the date of this Order.